Case 25-5210, Randi Bruce v. Adams and Reese LLP. Argument not to exceed 15 minutes per side. When you're ready, counsel, you may proceed for the appellant. May it please the court, Adams and Reese, Aaron McLeod for appellant Adams and Reese, and I reserve five minutes for rebuttal. Fine. The judgment below should be reversed for two reasons. First, the plausibility standard should be incorporated into the act, and second, under that standard, Bruce did not state a plausible claim for sexual harassment. The ordinary and well-established Twombly-Iqbal plausibility standard for pleadings should be incorporated as to plaintiffs who seek to invoke the act to avoid arbitration agreements for several reasons. Counsel, can I skip to the second question? Why doesn't it meet the plausibility standard to allege consistent, persistent, ongoing harassment? Well, in a word, Your Honor, because under that standard, Bruce didn't allege consistent, persistent, and severe, and that's the real key. This court and the Supreme Court have emphasized repeatedly. The complaint does use the words consistent, persistent, ongoing, continued. It doesn't use the words severe at all. Your Honor, you are correct, but when I say that she doesn't allege consistent, persistent, I'm invoking the plausibility standard. The court disregards conclusory labels and looks at the facts that have been pleaded. And as the Supreme Court, as in Farragher, and this court, and Kelly and Rayford and others have emphasized, a sexual harassment claim, particularly a hostile work environment claim, as alleged here, requires severe or pervasive conduct and, to use the court's word, extreme behavior before the alleged harassment is deemed to have altered the terms and conditions of employment. In fact, this court characterizes it as a high standard that plaintiffs must meet. In fact, I think it was in the Califf and Grace decisions from this court that the court stated an occasional offensive statement or utterance isn't enough. It is a difficult test to meet if plausibility is as standard as it should be. And compared to the facts in cases from this court, like Rayford or Clark or other cases, like Breeden, all of which we cited in briefing, the three offhand comments Bruce alleged, offensive and inappropriate as they were, did not come close to the level of abusive and severe conduct required. Even the district court here held point blank. None of Bruce's allegations showed severe conduct. So consider, for instance, the comments in this court's Rayford decision, where the harasser made direct references to the plaintiff's genitalia, where the harasser made a sexually suggestive reference as if proposing to have sexual contact with the plaintiff. And those comments were made three or four times a week, and they weren't enough. In the Clark case that this court issued, the harasser placed a vibrating pager on the plaintiff's thigh. The harasser pulled at her overalls after she supposedly told him she was wearing a thong. The harasser made vulgar jokes in her presence, and all of this put together was still insufficient to meet the high bar this court and the Supreme Court imposed on someone trying to state a hostile work environment claim. Clark was a summary judgment case, correct? I believe that is correct, Your Honor, but several of the other cases that we cited in our brief, like Breeden, as I was about to mention, were 12B6 cases. But, of course, despite Bruce's efforts to distinguish, we assume the facts pleaded here to be true in any event. And in Breeden, for instance, the plaintiff had to listen at work to customers on the phone with her joking about her getting naked, about her getting a, quote, boob job, end quote, and supposedly even having to listen to customers masturbate while on the phone with her in addition to other alleged facts. And this was still held far short of the high standard that this court imposes. Bruce's allegations here, such as they were, are on a lower order of magnitude. She alleged no physical touching. She alleged no sexual advances. She alleged no threats and no intimidation that occurred in the year that she was at Adams and Reese. What do you do with the statement and the complaint about the inappropriate comments on her engagement, her getting engaged? Your Honor, I do with that the same thing that I do with all the other comments and alleged facts that did not occur per the complaint within the one year that she was at Adams and Reese. The only specific comments alleged in the complaint where what was said is alleged that occurred within the one year that are pleaded as part of her sexual harassment theory are the ones that I've just gone through. December 2022, paragraph 357, he's making inappropriate comments relating to the engagement. Yes, Your Honor, but as I say, the only specific references to words that have been said to her, an allegation that says, for example, the defendant made inappropriate comments to me, that would be dispensed with under Twombly and Iqbal because that's simply a conclusion. It doesn't say what did the defendant say? How is something sexually inappropriate or suggestive or abusive in some quotes? Well, Your Honor, I'm not specifying that the plaintiff's allegations have to quote verbatim, but it is not asking too much, particularly under Twombly and Iqbal themselves, for a plaintiff to allege what was said, at least in a paraphrase, so that the court can know what is the allegation. It's similar to a plaintiff saying the defendant was negligent. Well, that may be, but it's not terribly helpful. So the district court below focused on the three specific comments that I've just mentioned or that we've briefed extensively. But we can focus on other things in the complaint if we thought that they were relevant to this inquiry, right? Well, Your Honor, I would respectfully suggest that there really are no further specifics. I don't think that was an answer to my question. We can look at other things in the complaint if we think they're relevant, correct? Oh, certainly, Your Honor. If the court, if I understand your question correctly, yes, the court can examine the entire complaint, but in the complaint the court will see a great deal of allegations, and this was in Bruce's brief here, that did not occur at Adams and Reese. Right. I'm talking about those, right? Let me ask you about another one. The $750 bonus payments paid out of the personal funds of Mr. Pinson, is that relevant to this inquiry? Well, Your Honor, as I recall, I think the allegation is that that occurred before she came over in May of 2022, but there's also a footnote in the briefing to indicate that Bruce never alleged or even argued, as I recall, how being paid a bonus out of Mr. Pinson's personal funds constituted abusive or hostile conduct of a sexual nature, so as to attempt to meet the high bar this court imposes for hostile work environment claims. And at any rate— You don't think there could be a relationship drawn with just a couple of quick inferences? Well, Your Honor, unfortunately there simply aren't allegations on which a reasonable inference could be made to link the alleged payment of a bonus to these other specific things that she alleged were said either to her or about her, the short skirt statement, for instance, and the use of ho-no instead of oh-no. Those are the only specific comments or instances of conduct that Bruce alleged within— The desk comment. And the comment—and it's not clear from the complaint if that comment was made to Ms. Bruce or simply in her hearing, but yes, that's the third comment that the district court examined closely and decided, even in the district court's words, that this was a very marginal case or a very close call, and that was the— So if it's a close call, aren't we supposed to make the inferences in favor of the plaintiff? And this also gets to the question why we are here now, which is whether the case should proceed in federal court versus in arbitration because of the EFAA. Yes, Your Honor. Well, the inferences that the court makes must be based on the allegations in the complaint. And the error the district court committed was in allowing what it admitted was a very marginal case in which it held there were no allegations of severe conduct at all. The error was in allowing a marginal case to proceed despite the Supreme Court and this court's emphasis over and over that the kind of allegations required to state a hostile work environment claim are extreme. They are severe. This court has decided plenty of cases in which physical touching or sexual propositions of sexual contact between the harasser and the defendant weren't enough. Does the EFAA context make a difference here? Well, Your Honor, the difference is that as of this morning, I checked one last time, no federal circuit court has decided whether or not the normal Twombly-Iqbal plausibility standard applies to whether a plaintiff can invoke the EFAA Act to avoid an arbitration agreement. And we believe it is eminently appropriate for that standard to be incorporated because, first of all, the text of the Act says plaintiffs must allege conduct constituting a sexual harassment dispute under federal law. And second, because the Supreme Court and this court and other courts have held when Congress passes a statute requiring a plaintiff to plead something but doesn't expressly say that it's going to set aside or reject the ordinary federal rules of civil procedure pleading regime, that regime is deemed to apply. Your Honor, I see my time has expired. May I continue answering your question? The answer of the questions. Thank you, Your Honor. I would direct the court in that respect to the Supreme Court's Califano decision, which was cited in Yoast, cited in our briefing, and to this court's Kruger case, which was an FMLA case, and the Second Circuit's case in Whiteside, just for instance, that was an FLSA case. But in all three of those cases, there was a statute. It either allowed a civil action to proceed or required a plaintiff to plead or allege something wilfulness, for instance, in Kruger. And in all those cases, the holding was if Congress doesn't specifically say to the contrary, the ordinary pleadings regime under the rules of civil procedure will govern. And that is why we urge the court to deem or to hold that the plausibility standard applies here, that Bruce did not meet it, and to reverse. Thank you. Thank you. Good morning. Good morning. May it please the court. My name is David Weatherman. I'm here representing the plaintiff in this matter. You know, there's an expression, you can't see the forest for the trees. And I think what's going on here is we're showing a forest and the opposing side is saying, no, that's just a bunch of trees. I don't ---- What this case is really about is a long period of sexual harassment that extended over two different law firms in a number of years. But we can only consider the second firm, right? Absolutely. And in that time, your own complaint says he was there sporadically. Correct. And I think that's an important thing. Because what we then say is that even though he was there sporadically, he still continued to harass her on a weekly basis, online team meetings. Even if he's not there, he's still making comments like, oh, no, on an almost weekly basis in these online teams meetings during that six-month period or whatever, once he started working from home more in January before her ultimate termination. So you agree, though, that the only thing we can consider is the second part, and we have to look at the specifics of what you allege to determine if it was severe or pervasive? Yes and no. I think context matters. And I think that the history between the two people is important and something that we would consider regardless of how long they were at Adams and Reese together. Obviously, how can it be as to ---- I get it if you're suing him. You're absolutely right. Sure. But when you're suing Adams and Reese, they can't be held accountable for what happened before. And we're not trying to hold them accountable for that. It's just to show the depth of this relationship and the fact that when things started to change, which was at Adams and Reese, that's when in September of 2022, Rob Pinder had the meeting with Brooke Ponder to try to start firing my client. That's when he met with her to originally try to find a way to fire her. Six, seven months later, he's successful in that. He gets her at a really weak period when she's having trouble showing up to work on time in violation of the ---- that's the disability discrimination, but that's not ---- That has nothing to do with the sexual harassment. We're not here yet. The only connection there is that he used her disability and her problems. The reason she had sort of an open schedule, she was allowed to come in when she wanted to, was because there were periods where she was dealing with a lot of medication issues, changed them up, and it was hard to have a consistent morning routine. No, I get that, but I thought that Pinson, correct me if I'm wrong, I thought your complaint said Pinson was encouraging her, because at Waller, I think that was the first one, he allowed her to be on a flexible schedule, and he was trying to help her get a flexible schedule. Absolutely, and that all changed. That's the point. That all changed after September of 2022 at Adams and Reese when he started trying to find a way to fire her, when he met with Brooke Ponder to start working towards her termination. And I don't want to put the cart before the horse on all this, but all of this does presuppose sexual harassment in a hostile work environment, and quite frankly, I don't understand. When we're talking about severe conduct, we're talking about pervasive, we're talking about consistent. Calling a paralegal a hoe on a weekly basis is pretty bad. That's not exactly what the complaint says. No, but when you say hoe no to your paralegal, you're implying something there. You're not saying hoe no for no reason. Sorry, I didn't mean to interrupt. The question that your opponent is homing in on is whether this is severe and pervasive. So let's assume it's severe. Is it pervasive? Am I correct that we're going to the amended complaint and many of the allegations are in the 350s and 360? You have in 361, Mr. Pinson would say hoe no instead of oh no when talking to Ms. Bruce. So you say would say. So the inference there is that it happens frequently.  Okay, and then on 360, Mr. Pinson would say let's have Randy go down there in a short skirt. So again, would say the inference, and we're supposed to draw the inferences in your favor, is this happened frequently. Correct. So is your response then to your opponent that, in fact, you have met the severe and pervasive pleading standards of Iqbal and Twombly, or do you also want to argue that Iqbal and Twombly shouldn't apply here in the EFAA context? No, I have no problem with Twombly-Iqbal applying this. I think it has to. I mean, it's just a basic motion to dismiss standard, and I think that's really what we're looking at in this context. I can't imagine Congress was wanting to have some whole new method of determining a motion to dismiss. So then how do you deal with the cases that your opponent has suggested, say, that in order to show a hostile work environment, it has to be unbelievably awful? First off, I don't agree with that, that it has to be unbelievably awful. No, I was summarizing. Right, no, I understand. I think if you're a partner in a law firm, your employee is a paralegal who's in law school, there's already an awful power dynamic there. And I don't know if you recall what it's like being a brand-new attorney or even a law student working in a law firm, but it's terribly intimidating. And I think that the context of this is different than, you know, at a fast food restaurant or something. I think that, one, there's expectations that you are treated with a level of civility in a law firm by law firm partners at your job. I guess you would hope that's the case and that should be the case, but that's not the standard, right? I mean, that would change. That would turn Harris on its head. You see what I'm saying? In other words— I sort of agree, but at the same time— When you're talking about basic levels of civility, as Judge Moore just said, our case law requires something much different than that. I mean, any of these comments don't—one comment in isolation doesn't match civility. But when you have those comments coming on the heels of years of unwanted invitations— I get that, but again, that's against Pinson. You've got to—you keep drawing in. And I totally agree with you. If you were suing Pinson, this is open and shut, okay? But you're suing the law firm, and the law firm can't be held accountable for things that happened before that. And again, I'm not trying to hold them accountable for it, but I think that context is really important here, and it's that context that puts these off-the-cuff remarks, these ho-nos, these— I would—you know, it would be hot to see you in another— They work for the employer matters. Like, let's say they were boyfriend and girlfriend, and he was sexually not harassed before that, and then they come into the firm together, and there's a few sporadic comments. Do you have—I mean, is that really—does that meet the standard of Harris and its progeny? I don't think it's supposed to meet that standard. Again, I think it's just supposed to show context, and that's my whole argument. Well, of course it has to meet that standard. Well, right. But that's my point, is that it's to provide context for these later comments, of which Adams and Reese is responsible. I mean, she complained about this to Will Cheek, a partner at Adams and Reese, while they were at Adams and Reese. I'm sorry. You're bringing all that in, so is there a case for that? I don't. I haven't found one, if there is. Again, I looked at it more as factually. What is your best case to show that these instances of conduct at Adams and Reese qualifies as pervasive? Well, I think if you look at the Clark v. UPS case, defendants pointed that as a case that went against this, but they were dealing with two different situations there, and while they addressed this case for a woman named Newt, they addressed this case for this woman named Newt and found that it didn't, but for Clark, the actual plaintiff in Clark v. UPS, it was determined that Clark prevented 17 incidents of harassment by Brock. Seventeens? Well, yeah. I mean, I don't think so. I think there's at least 17 instances here. I mean, these comments of, oh, no, happened weekly for months. Again, that's not what the complaint says. As Judge Moore said, it does say would say, but you're asking us to, I think, read into this complaint in a way that I'm not sure is supported. What the complaint says is that he made these inappropriate comments on a weekly basis during these weekly meetings. He would say these things on a weekly basis. Wait. Where is the weekly? It doesn't say that. Well, it says weekly teams meetings. It doesn't say teams meetings either. The briefing says teams meetings. It does say team meetings. Team meetings, yes. Those are all online. Well, that's what you said in the briefing, but in the complaint, I was really just, I'm struggling with what is in the complaint versus what you're asking us to assume happened. I guess I'm failing to see the distinction between a weekly team meeting, meaning a meeting of the whole team. Which is, again, not what the complaint, it doesn't say weekly. It doesn't say weekly. What's it say? It says. Didn't you write it? I did. You know, that's been the whole thing. You may have another paragraph that you want to point us to, but 359 says Mr. Pinson's comments and jokes started occurring in team meetings at Adams and Reese. There may be another paragraph that you want us to look at. You know, that could well be the full extent of it, is team meetings. And, you know, if it's important to say that those happen monthly, weekly, I mean, team meetings happen regularly. I think that's what's important here. I do think, Judge, the PARS question really gets at something that's troubling me about, the complaint also says it happened when he was in the office, yet also says he was in the office rarely. No, that was the point we were trying to make, is he wasn't in the office as much, but he would still make these comments during weekly team meetings. So the team meetings were, like, online the way we started in on after COVID, that people did everything using teams with a capital T. Correct, Your Honor. Correct, Your Honor. And that's what was happening here. It says in team meetings at Adams and Reese. I mean, the way I would read that is at the firm. Sure, I get that. But I think I was probably trying to draw a distinction between that and Waller, the previous law firm. Adams and Reese is opposed to Waller. But, I mean, we can read the complaint in your favor. We can't just read things into the complaint that don't exist.  That's fair, Your Honor, and you're right. I mean, if you guys want to read team meetings as something other than regularly occurring, I don't have any control over that. Well, let me tell you how I read it. You should tell me why I'm wrong. It says team meetings at Adams and Reese, and then I combine that with he was there sporadically. Right. And that's where I'm struggling. And that must have been a drafting issue, I guess, because what I was trying to convey there was that he wasn't in there as much, but he was still able to get to her at these team meetings on a regular basis. And that's the picture we're trying to paint in this complaint. And I guess the point is that when you're looking at it, I mean, I'll continue to distinguish it. The Breeden case, the Rayford case, the Batty case, the ones that they point to as not extreme enough, Rayford was post-trial with a fully developed record. Breeden, there was no directed harassment. It was customers. It wasn't from a supervisor. And then in Batty, the comments were one or two times over two years, not supervisory, not sexual in nature. So I think all of those cases that he tries to point out as reasons why we don't show enough are easily distinguishable from this. And I think it's easily distinguishable from this on those counts. Can I ask you what relates to means in the statute? Yeah. What does that mean? How should we interpret the words relates to? As far as under the EFA determining whether it's a case or not. You want to bring the ADA into court and avoid the arbitration. And it says it has to relates to, but we all agree the sexual harassment was different in kind than the ADA. So how do I interpret relates to in a fashion that ties them together? Yeah. I would look at it like common nucleus of awkward fact. It's got the same people, the same locations. You've got there's overlap. Was she terminated? Was her termination directly because of her disability? Was it because of sexual harassment? That would be true if you had a breach of contract, an ADA, an overtime complaint, and a sexual harassment. I mean, you always have common nucleus if it's the place of employment and all that stuff. So there's a new case that just came out. It's one of the cases that defense relied on. My time's over. You can finish your answer. Yeah. Can you tell me the case? Yeah. It's Mira. It's out of the Southern District in New York. It's called Mira versus. That's all right. I can find it. Yeah. It's the Mira case. I've got it right here. Mira versus S.A. Hospitality Group. Earlier in the life of the case, it was determined that they were separable, and it separated out the sexual harassment from these other claims. However, in November, three weeks ago, they overturned that and basically said, you know, if it's part of the case, it's part of the case. This is the Second Circuit then? No, sorry. This is the Southern District. They overturned themselves?  Sorry. Yeah, they did.  And I think that they do a really great job of explaining that there were two. Yeah, even the claims that were sort of looked at as, like, class action, FLSA-type claims, they said related and brought in. So originally there were two claims they separated out and two claims that, you know, there are four claims and they separate two and two. But after when this Mira, when they revisited it, they said they all four. And how do you spell Mira? M-E-R-A. Thank you. Your red light is on. Yes, it is. Are there any other questions? No, thank you. Thank you. Thank you. Your Honor, just a few comments, if I may, on rebuttal. As I think, Judge Thapar, you have mentioned, Bruce's references to the termination that we heard again this morning are not germane to the issue before this court. The district court was clear in the opinion that there was no quid pro quo claim stated or attempted to be stated in the complaint. And to the extent any retaliation claim was intended to be stated, it was dismissed. That's not been cross-appealed. In fact, and this goes to another point related to a question that the court asked, Bruce's complaint is careful and goes to some length to distinguish between the ADA, I'll call it the retaliation claim or the failure to accommodate claim that led to termination, and the sexual harassment or hostile work environment claim. In fact, the hostile work environment claim doesn't even adopt and incorporate the allegations in the preceding, the lengthy factual allegations in the preceding ADA claim. So, as the district court itself noted, the termination and all of that is not germane to the issue before the court any more than the conduct that Bruce's counsel has mentioned again that occurred elsewhere at the Waller-Lanston firm. As our reply brief points out, and I believe we do cite several cases in the reply brief on this, it's fundamental to a Title VII claim for employment discrimination that there be an employment relationship. And Adams and Reese cannot be held responsible for conduct that may or may not have occurred by Mr. Pinson when neither he nor Ms. Bruce had an employment relationship with Adams and Reese. And it's interesting in that connection to note by the by that she apparently chose to follow Mr. Pinson when he transitioned from Waller-Lanston to Adams and Reese. I'd also like to point out Ms. Bruce has cited, as I hear and as I've read her brief, no authority that would allow a favorable comparison by Bruce of the allegations of sexual harassment here to some other case from this court or from the Supreme Court where similar allegations marginal, as the district court called these, were nevertheless held to be enough to state a plausible claim for sexual harassment or for hostile work environment. I wanted to ask you about the question of relating to, that Judge Lepar was asking the opponent, why is your opponent's position on what that means not the correct position, don't we want to avoid piecemeal litigation? Well, Your Honor, that is a large issue and I will do my best to answer it in the time that I have. When we interpret the EFA Act's provision that an agreement is unenforceable as to a case which is related to a sexual harassment dispute, I think that's the language we're talking about. Congress is presumed to legislate or to amend a prior statute against a backdrop of the prior, not only the prior FAA itself, but also of the deep body of pro-arbitration, profoundly pro-arbitration case law. That was the whole reason for this statute was to create an exception. That argument doesn't get much traction with me, I guess. If that's your only argument, then that's it. Well, I would respectfully concede that obviously Congress created an exception here, but the question that's not answered by the plain text itself is just how far is that exception supposed to operate? For instance, is a plaintiff who includes one sexual harassment claim in a complaint that may have ten claims against three different defendants, are they allowed to completely avoid otherwise binding arbitration agreements against all the defendants on all the claims? Because the statute uses the word with respect to a case which is filed under federal law and relates to the sexual assault dispute or sexual harassment dispute. So Congress did use the word a case as opposed to a claim. That's correct, Your Honor, and the critical point is that Congress didn't stop there. Congress did use the word case, but it continued to say, after that language Your Honor quoted, a case which is filed under federal, state, or tribal law and relates to the sexual harassment dispute. And that gets back to what I was saying to Judge Ritzley. But doesn't the case relate to the sexual assault dispute in the sense that the case here arguably has a sexual harassment dispute in it? Put aside your critique of whether this complaint meets Iqbal Twombly on stating a claim of sexual hostile environment. If it were an outrageous claim, why wouldn't this statute apply, even though there's also a perfectly, hypothetically valid ADA claim? Your Honor, I see my time has expired. But you may answer my question. The reason that the Court should not read relate to that broadly, particularly with a complaint that delineates so carefully between the facts that are pertinent to each claim, with essentially no overlap, is that profoundly many decades old presumption that to the extent any claim can be arbitrated, it must be arbitrated, even if that means piecemeal litigation. Your position then, just to be clear, is if hypothetically there was a wonderful hostile environment claim and a wonderful ADA claim, you would read the statutory provision to say that they would have to be separated and that the EFAA would allow for the Court to decide the hostile environment claim, but the ADA claim would have to go to arbitration. Is that correct? That's your position? It is my position if the allegations provide a link between them, that is correct. The pre-existing presumption that everything that can be arbitrated must be arbitrated survived the passage of the EFAA Act, except with respect to sexual harassment claims themselves. That's correct, Your Honor. Thank you. Thank you. Thank you both for the argument, and the case will be submitted and the Court will take a brief recess.